UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ROXANE SMITH | CIVIL ACTION |
| VERSUS | NO. 21-1085 |
| DEPUY SYNTHES INC., ET AL. | SECTION: "P" (3) |

### ORDER AND REASONS

Before the Court is a Motion for Summary Judgment filed on behalf of Defendants DePuy Synthes, Inc., DePuy Synthes Sales, Inc., Synthes USA, LLC, Medical Device Business Services, Inc., Johnson & Johnson, Synthes USA Products LLC, and DePuy Synthes Products, Inc. (collectively, "DePuy").[1] Plaintiff Roxane Smith has filed an opposition,[2] and DePuy has filed a reply.[3] For all the reasons that follow, DePuy's motion is GRANTED.

**I. BACKGROUND**

This is a product liability action involving a DePuy medical device called the DePuy Synthes LCP® Periarticular Plating System 4.5 mm LCP® Proximal Tibia Plate ("the DePuy plate"). On November 9, 2019, Plaintiff fell while climbing up the steps of a camper trailer[4] and broke her left tibia and fibula. Plaintiff, who suffered a closed, comminuted proximal tibial fracture that extended from just below her tibial plateau to roughly the first third of her tibial shaft as well as a proximal fibula fracture,[5] sought medical treatment at Ochsner Clinic and eventually came under the care of Dr. James Mautner, a board certified orthopedic surgeon.[6] On November 11, 2019, Dr. Mautner performed a preliminary surgery and used an external fixator to stabilize

---

[1] R. Doc. 97.
[2] R. Doc. 106.
[3] R. Doc. 109.
[4] R. Doc. 97-10 at 5.
[5] R. Doc. 38 at 2, ¶ 3; R. Doc. 106-3 at 14–15.
[6] R. Doc. 106-3 at 11.

Plaintiff's tibia.[7] Dr. Mautner performed a more definitive surgery on November 14, 2019, and after removing the external fixator, he used the DePuy plate with 4.5mm screws to realign Plaintiff's tibia.[8] Because Plaintiff had very little intact bone between the surface of her knee joint and the fracture,[9] Dr. Mautner believed this plate would achieve good alignment of the bone and would give Plaintiff the best outcome.[10] The plate is designed with a number of screw holes on its shaft to give the surgeon multiple screw placement options based on the patient's anatomy and injury.[11]

Plaintiff's implant surgery itself was unremarkable, and Dr. Mautner instructed Plaintiff, who admitted that she smoked just under a pack of cigarettes each day,[12] to stop smoking and to forego weightbearing activity.[13] When a patient suffers a fracture, there is always a risk the broken bone will not heal.[14] Certain medical conditions and activities can cause delayed bone healing or delayed union.[15] If a patient's bone does not heal, the patient's plate can eventually break,[16] and Dr. Mautner was aware of this fact when he selected this DePuy plate for Plaintiff.[17] Plaintiff was warned to stop smoking because smoking can impair wound healing and can increase the risk of nonunion or delayed union by 30%,[18] and can also increase the risk of infection.[19] Plaintiff, however, continued to smoke throughout the material time period.[20]

---

[7] *Id*. at 14–15.
[8] *Id*. at 33.
[9] *Id*. at 17.
[10] R. Doc. 106-3 at 17–18.
[11] *Id*. at 37, 71–73.
[12] R. Doc. 97-7 at 3–4.
[13] *Id*. at 8.
[14] R. Doc. 106-3 at 22.
[15] R. Doc. 97-4 at 7.
[16] R. Doc. 106-3 at 106.
[17] *Id*.
[18] *Id*. at 23.
[19] *Id*. at 23–24.
[20] R. Doc. 97-10 at 3–4.

2

While Plaintiff's course of treatment was initially unremarkable, she developed an infection at her proximal tibia implant site,[21] and she underwent a left knee arthroscopy and debridement surgery on January 27, 2020.[22] Dr. Mautner placed Plaintiff on IV antibiotics to help fight infection so her bone would have a better chance of healing.[23]

After Plaintiff, who was experiencing severe pain in May of 2020, sought medical treatment for her increased pain, a May 18, 2020 x-ray showed her plate had broken.[24] The plate broke due to fatigue,[25] which Plaintiff's metallurgical expert described as a progressive failure that is caused by repeated or cyclic stress.[26] Although the DePuy plate broke, it remained intact long enough for the bone closest to Plaintiff's knee joint to heal.[27] On June 29, 2020, Dr. Mautner again performed surgery on Plaintiff, removing the broken plate and replacing it with a Synthes intramedullary tibular nail and interlocking screws to repair some still unhealed bone on the lower part of Plaintiff's tibia.[28] On October 12, 2021, after she suffered another infection, Plaintiff's hardware was removed,[29] but by then her bones had healed, and by August of 2022, x-rays revealed a well-healed fracture.[30]

On May 12, 2021, Plaintiff filed suit against DePuy in Louisiana's 24th Judicial District Court in Jefferson Parish, alleging that the DePuy plate was defective under the Louisiana Products Liability Act ("LPLA")[31] as well as Louisiana's law of redhibition and that DePuy breached an implied warranty of fitness. DePuy removed this action, based on federal diversity jurisdiction,

---

[21] R. Doc. 97-7 at 3.
[22] R. Doc. 106-3 at 49–51.
[23] *Id*. at 50–56.
[24] *Id.* at 69–70.
[25] R. Doc. 97-4 at 7.
[26] R. Doc. 97-15 at 8.
[27] R. Doc. 106-3 at 72–73.
[28] R. Doc. 97-4 at 3.
[29] *Id*.
[30] R. Doc. 106-3 at 82–85.
[31] La. Rev. Stat. §§ 9:2800.51–.60.

under 28 U.S.C. § 1332,[32] and the case, having progressed through discovery, is ripe for adjudication.

## II. THE PRESENT MOTION

DePuy has moved for summary judgment under Federal Rule of Civil Procedure 56, arguing: (1) Plaintiff lacks evidence to support her design and manufacturing defect claims under the LPLA; (2) Plaintiff's warning claims should be dismissed because DePuy adequately warned of the risks associated with its plate; Plaintiff's surgeon understood the risks, and a different warning would have made no difference; (3) Plaintiff's express warranty and redhibition claims are unsupported by the evidence; and (4) Plaintiff's claim for breach of an implied warranty is not cognizable under Louisiana law.

In opposition, Plaintiff argues there are several material issues of fact fatal to summary judgment. Plaintiff argues DePuy's plate was defective in design because it contained too many screw holes along the shaft of the plate, and if DePuy had designed the plate with an insert or "fillers" for the unused screw holes, this would have "reduce[d] stress at the cross sections" and would have lengthened the useful life of the plate.[33] Plaintiff also argues DePuy failed to supply physicians with important information regarding fatigue-related failures in its plates. According to Plaintiff, DePuy failed to warn physicians where the weakest section of the plate was located.[34] Plaintiff also contends a material issue of fact exists regarding the sterilization process for DePuy's screws, and that DePuy's sterilization process could have caused Plaintiff's initial infection, which may have ultimately led to her delayed healing. Plaintiff also contends a complaint report that DePuy sent to the United States Food and Drug Administration ("FDA") creates a material issue

---

[32] R. Doc. 1.
[33] R. Doc. 106 at 12.
[34] *Id.* at 5.

4

of fact fatal to summary judgment because the complaint report is an admission by DePuy that its plate may have caused or contributed to Plaintiff's injury.[35]

## III.  LAW AND ANALYSIS

Summary judgment is proper when there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[36] The court must view the evidence in the light most favorable to the nonmovant.[37] Initially, the movant bears the burden of showing the absence of a genuine issue as to any material fact,[38] but the burden then shifts to the nonmovant to come forward with specific facts showing there is a genuine dispute for trial.[39] A dispute about a material fact is one upon which a reasonable jury could return a verdict for the nonmoving party based upon the jury's resolution of the particular factual issue.[40] "When assessing whether a dispute to any material fact exists, [the Court] consider[s] all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."[41]

The bulk of Plaintiff's claims in this case arise under the LPLA, which provides the exclusive theories of liability for manufacturers for damage caused by their products.[42] The LPLA states "[t]he manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or any other person

---

[35] *Id.* at 14–16.
[36] FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).
[37] *Coleman v. Hous. Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997).
[38] *Celotex*, 477 U.S. at 323.
[39] *See* FED. R. CIV. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).
[40] *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 956 (5th Cir. 1993).
[41] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins.*, 530 F.3d 395, 398–99 (5th Cir. 2008) (first citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); and then citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).
[42] LA. REV. STAT. § 9:2800.52.

or entity."[43] And the LPLA provides four exclusive theories under which a product can be deemed unreasonably dangerous—construction or composition, design, inadequate warning, and failure to conform to express warranties.[44] Plaintiff asserts all four of these theories, and she also contends DePuy is liable to her because the DePuy plate contained redhibitory vices under Louisiana law, and because the plate did not conform to an implied warranty of fitness. Plaintiff also contends DePuy admitted its product caused her damages.

### A. Plaintiff's Design Defect Claim

DePuy seeks summary judgment on Plaintiff's design defect claim because DePuy argues Plaintiff has no evidence of a safer alternative design. Under the LPLA, "[a] product is unreasonably dangerous in design if, at the time the product left its manufacturer's control: (1) [t]here existed an alternative design for the product that was capable of preventing the claimant's damage; and (2) [t]he likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting the alternative design."[45] An alternative design must also be reasonably specific and not based on mere speculation because "[v]ague alternative concepts and suggestions—lacking in specific detail— do not provide a jury with enough information to determine whether a suggested alternative meets the statute's requirements."[46] Because alternative design cases generally present scientific or technical issues, design defect cases almost always require expert testimony.[47]

DePuy designed its plate with multiple screw holes along the shaft of the plate, so the implanting surgeon would have the option of choosing from different holes when affixing the plate

---

[43] LA. REV. STAT. § 9:2800.54(A).
[44] LA. REV. STAT. § 9:2800.54(B)(1)–(4).
[45] LA. REV. STAT. § 9:2800.56.
[46] *Vallee v. Crown Equip. Corp.*, No. 22-30053, 2023 WL 2964407, at *2 (5th Cir. Apr. 14, 2023).
[47] *See, e.g., Stewart v. Cap. Safety USA*, 867 F.3d 517, 521 (5th Cir. 2017) (collecting cases).

to the tibia, but Plaintiff argues the placement of these screw holes makes the plate weaker and creates a design defect. Plaintiff argues it would have been safer for DePuy to reduce the number of holes along the shaft of the plate or to provide the surgeon with fillers to reduce the stress at the cross sections.[48] Plaintiff contends that while other manufacturers provide these fillers, DePuy chose not to adopt an alternative design because it would "hurt [its] bottom line."[49] Plaintiff, however, failed to identify any such manufacturer. Plaintiff also contends that Dr. Mautner testified these other companies provide surgeons with fillers to reduce stress at the cross sections.[50] Plaintiff maintains Dr. Mautner admitted the DePuy plate is "inherently defective because of the screw hole or the number of screw holes,"[51] and that Mautner advanced alternative design ideas that would reduce stress on the plates and increase their function.[52]

Plaintiff retained Dawn DiMarco, a metallurgical expert, to examine her implant after it was removed. Plaintiff's expert metallurgist admitted the plate failed as a result of fatigue,[53] and that she could offer no opinions as to a safer alternative design for the tibia plate.[54] Moreover, while Plaintiff argues that Dr. Mautner opined that the DePuy plate is inherently defective because of the extra screw holes, Dr. Mautner admitted there is no tibial plate on the market that eliminates the risk of nonunion or of fatigue fractures,[55] and he also admitted he was unaware of, and he never used a plate that filled in unused screw holes to strengthen the device.[56] Contrary to Plaintiff's arguments, Dr. Mautner admitted the screw holes are a "necessary design feature" that allow for

---

[48] R. Doc. 106 at 12.
[49] *Id*.
[50] *Id*.
[51] *Id*. at 11.
[52] *Id.* at 12.
[53] R. Doc. 106-4 at 4.
[54] R. Doc. 97-12 at 5.
[55] R. Doc. 97-6 at 30.
[56] *Id.* at 32.

alignment of the plate with the bone,[57] and his testimony fails to suggest an alternative design capable of preventing Plaintiff's damages in this case. In fact, Dr. Mautner's testimony directly contradicts Plaintiff's arguments because Dr. Mautner admitted that any tibial plate that used fillers in the screw holes was experimental,[58] and he does not know of any studies showing whether fillers actually worked, and he admitted that even if a plate contained some sort of filler in the extra screw holes, it would be impossible to entirely eliminate the risk of stress factors.[59] Dr. Mautner described the DePuy tibial plates as "good plates," and he continues to use them regularly.[60]

Because neither Ms. DiMarco nor Dr. Mautner, the only liability experts disclosed by Plaintiff,[61] identified an alternative design shown to prevent plate breakage, and because Plaintiff has brought forth nothing more than a vague alternative concept for which she fails to offer scientific support, she cannot meet her burden of proof under the LPLA, and her design defect claim must be dismissed.

### B. Plaintiff's Failure-to-Warn Claim

Plaintiff alleges the DePuy plate was unreasonably dangerous when it left DePuy's control because DePuy failed to provide an adequate warning of its product's defect. DePuy, on the other hand, contends it is entitled to summary judgment, because: (a) it warned of the risk that the plate could break; (b) Plaintiff has no evidence a different warning would have made a difference; and (c) a different warning would have made no difference in this case because Dr. Mautner did not recall reading DePuy's package inserts for the plate.

---

[57] R. Doc. 106-3 at 93.
[58] R. Doc. 97-3 at 32.
[59] R. Doc. 97-6 at 31-32.
[60] R. Doc. 106-3 at 94.
[61] *See* R. Doc. 82.

Under the LPLA, a product is unreasonably dangerous because an adequate warning about the product has not been provided if, at the time the product left its manufacturer's control, the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of the potentially dangerous characteristic to users and handlers of the product.[62] Louisiana applies the learned intermediary doctrine to failure-to-warn claims involving medical devices.[63] Under the learned intermediary doctrine, a manufacturer's obligation to warn consumers is fulfilled when the patient's treating physician is informed of potential risks of using the device, so the physician can intelligently decide whether to use or recommend use of the product and can also provide proper medical advice to the patient.[64] Thus, when the learned intermediary doctrine applies, the issue becomes whether the manufacturer adequately warned the *treating physician*.[65]

The Fifth Circuit has acknowledged that the following two-prong test governs failure-to-warn (or inadequate warning) claims under the LPLA when the learned intermediary doctrine is applicable.[66] First, the plaintiff must show that the defendant either provided no warning or provided an inadequate warning to the physician of the product's risk that was otherwise unknown to the physician.[67] Second, the plaintiff must show that this failure to warn the physician was both a factual and proximate cause of the plaintiff's injury.[68]

Here, the Court finds Plaintiff's failure-to-warn claim fails for multiple reasons. For starters, DePuy's package insert warned multiple times of potential breakage of the plate, the risk

---

[62] LA. REV. STAT. § 2800.57(A).
[63] *Celina v. Biotronik, Inc*., 536 F. Supp. 3d 89, 108 (E.D. La. 2021) (citing *Willett v. Baxter Int'l, Inc*., 929 F.2d 1094, 1098–99 (5th Cir. 1991)).
[64] *Id.* (quoting *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 267 (5th Cir. 2002)).
[65] *See Stahl*, 283 F.3d at 268.
[66] *Id.* at 265–66.
[67] *Id*. (citing *Willett*, 929 F.2d at 1098).
[68] *Id*. at 266 (citing *Willett*, 929 F.2d at 1098).

ultimately suffered by Plaintiff.[69] In its first paragraph, the package insert states the implant can "eventually break due to metal fatigue."[70] One of the "Possible Adverse Effects" identified by DePuy is "nonunion or delayed union which can lead to breakage of the implant."[71] DePuy's package insert also makes clear that its implants can break at any time if they are subjected to sufficient stresses.[72] DePuy's package insert also warns that its devices "can break when subjected to the increased loading associated with delayed union or nonunion."[73] Not only did DePuy warn of the risk of breakage, Plaintiff's treating physician described these warnings as "common knowledge."[74] In fact, Dr. Mautner admitted he had known of this potential risk for a very long time,[75] and that when he chose this particular tibial plate for Plaintiff, he had all the information necessary to make a proper risk-benefit decision for his patient.[76] When asked whether the stresses from Plaintiff's delayed bone healing contributed to the plate's fatigue failure in this case, he testified it could,[77] explaining that it is common knowledge that a delayed union or nonunion can cause the implant to break due to fatigue failure.[78]

Turning specifically to the issue of DePuy's alleged failure to warn physicians regarding cross section weakness, even assuming DePuy's package inserts did not provide an adequate warning of this alleged defect—something DePuy in no way concedes and for which Plaintiff has not offered proof—in this particular case, the operating surgeon, who was aware of this specific

---

[69] R. Doc. 97-5.
[70] *Id.* at 2.
[71] *Id.* at 4.
[72] *Id.* at 2.
[73] *Id.* at 3.
[74] R. Doc. 97-6 at 12–13.
[75] *Id.*
[76] *Id.* at 33.
[77] *Id.* at 30.
[78] *Id.* at 13.

risk, needed no such warning because he admitted that "[w]hen plates break down, they break through the screw hole" because "[i]t's just a weaker part of the plate."[79]

In addition, Dr. Mautner could not recall reading the plate's package insert. While DePuy warned of the risk of hardware failure in the package inserts, and Dr. Mautner admitted he was aware of the risk of hardware failure when he selected the DePuy plate, he could not recall ever reading the package insert containing DePuy's warnings.[80] When a treating physician "does not recall ever reading the label at issue, the learned intermediary doctrine requires summary judgment for the manufacturer."[81] For all these reasons, the Court must grant summary judgment for DePuy on Plaintiff's failure-to-warn claim.

### C. Plaintiff's Manufacturing Defect Claim

A product is unreasonably dangerous in construction or composition if "at the time the product left its manufacturer's control, the product deviated in a material way from the manufacturer's specifications or performance standards for the product or from otherwise identical products manufactured by the same manufacturer."[82] To prevail on a manufacturing defect claim, a plaintiff must demonstrate not only what a manufacturer's specifications or performance standards are for a particular product, but how the product materially deviated from those standards so as to render it unreasonably dangerous.[83]

In this case, Plaintiff's metallurgist Dawn Dimarco admitted she did not review any manufacturing specifications for the plate,[84] did not review any testing of the plate,[85] did not

---

[79] R. Doc. 106-3 at 93.
[80] R. Doc. 97-6 at 11.
[81] *In re Taxotere (Docetaxel) Prods. Liab. Litig.*, No.16-17061, 2022 WL 245605, at *3 (E.D. La. Jan. 11, 2022) (citing *Pustejovsky v. Pliva, Inc.*, 623 F.3d 271, 277 (5th Cir. 2010)).
[82] LA. REV. STAT. § 9:2800.55.
[83] *Cadet v. American Honda Motor Co.*, No. 24-1320, 2025 WL 1179462, at *2 (E.D. La. May 23, 2025) (quoting *Welch v. Technotrim, Inc.*, 778 So.2d 728, 733 (La. App. 2 Cir. 2001)).
[84] R. Doc. 97-12 at 3.
[85] *Id.*

review any of the engineering drawings of the plate,[86] and did not review any design documents related to the plate.[87] Ms. Dimarco, therefore, can offer no opinion at trial regarding what the specifications and performance standards were for this plate, or how DePuy may have deviated from those standards when the plate was manufactured.[88] Federal courts in Louisiana routinely grant summary judgment in LPLA cases involving alleged manufacturing defects when no expert has offered an opinion regarding how a product deviated from the manufacturer's specifications.[89]

While Plaintiff has offered no evidence the DePuy plate deviated from DePuy's specifications or performance standards in its construction or composition, Plaintiff nonetheless argues there is a genuine issue of material fact regarding the sterilization of the screws that were used during her November 14, 2019 surgery. She argues there may have been a problem with their sterilization, and that this may have been the cause of her initial infection, and summary judgment on her manufacturing claim should be denied.[90] DePuy argues it is undisputed the box containing the screws and instruments used in Plaintiff's surgery were not designated by DePuy as sterilized,[91] that Plaintiff has no evidence to the contrary, and that DePuy's uncontroverted summary judgment evidence shows Plaintiff's screws were not designated as sterile in DePuy's sale documents.[92]

---

[86] *Id.*
[87] *Id.*
[88] *Id.* at 5.
[89] *See, e.g.*, *Toups v. Synthes, Inc.*, No. 14-2544, 2015 WL 6738541, at *5–6 (E.D. La. Nov. 4, 2015) (plaintiff's manufacturing defect claim dismissed for lack of an expert opinion regarding how the internal fixation device in that case deviated from the manufacturer's specifications); *see also Power v. Louisville Ladder Inc.*, No. 19-14627, 2020 WL 3971278, at *3 (E.D. La. July 14, 2020) (granting summary judgment on the plaintiff's composition defect claim when the plaintiff failed to meet his burden of showing the manufacturer's specifications or performance standards or how the product materially deviated from those standards).
[90] R. Doc. 106 at 6.
[91] R. Doc. 109 at 2. DePuy relies on the testimony of René Haag, its corporate representative, to show that the screws in this case were sold as unsterilized. *Id.* (citing R. Doc. 109-1 at 57). But Haag, at one point, admitted he could not say whether the subject screws were sterilized by DePuy or not. *See* R. Doc. 106-6 at 59. To the extent these potentially inconsistent statements create a dispute of fact, the dispute is not a material one because DePuy does, in fact, offer both sterilized and non-sterilized screws, and it is undisputed in this summary judgment record that the hospital would be responsible for sterilizing any unsterilized screws, and Plaintiff has failed to offer any evidence regarding the sterilization process in her case and has offered no evidence tending to prove a sterilization problem, involving either sterilized or unsterilized screws, caused her infection or that this caused the breakage of her plate.
[92] R. Doc. 109 at 2–4.

DePuy offers both sterilized and non-sterilized products for sale to its customers,[93] and it argues because the hospital purchased non-sterilized screws from DePuy,[94] the hospital would have been responsible for sterilizing the screws before they were used in Plaintiff's procedure.[95]

The Court finds Plaintiff has failed to raise an issue sufficient to defeat summary judgment on her manufacturing defect claim. The sale of non-sterilized screws does not amount to a defect in the manufacturing process when non-sterilized screws are also an intentional product offering by DePuy. While Plaintiff has raised the specter of a potential issue of fact regarding the sterilization of her surgical screws, she has failed to produce any evidence regarding the sterilization process that was used in her case,[96] and she has also failed to offer any evidence that her infection was caused by a sterilization failure. Indeed, even if Plaintiff's infection was caused by a sterilization problem, she has failed to offer any proof the infection arose from any fault on the part of DePuy or that her January 2020 infection is what caused her to experience nonunion of her fracture, and, critically, she fails to offer any proof that connects the sterilization issue to the breakage of her plate. Because Plaintiff has no actual summary judgment evidence that a defect in any DePuy product used in her case deviated from DePuy's specifications or performance standards in manufacturing (or in packaging or sterilization), and that such a failure caused her to suffer damages, Plaintiff's manufacturing defect claim cannot survive summary judgment.

---

[93] R. Doc. 109-1 at 2.
[94] R. Doc. 109 at 2.
[95] The unrebutted testimony of René Haag, DePuy's corporate representative, demonstrates that nonsterile products require sterilization by the hospital prior to use, and once a sterile product is removed from its packaging, the hospital is responsible for ensuring the sterile transfer of the product to the sterile field in the operating room. *See* R. Doc. 109-1 at 5–6,16.
[96] Plaintiff failed to engage in any discovery of Ochsner Medical Center, did not attempt to obtain any information regarding the hospital's sterilization practices, and has failed to produce any testimony regarding sterilization of the medical devices used in her procedure. In addition, Dr. Mautner never opined that the source of Plaintiff's infection was due to improper sterilization of the medical devices used in the surgery, and Plaintiff failed to designate any other experts to opine on the origins of the infection.

### D. Plaintiff's Express Warranty Claim

Under the LPLA, a manufacturer can be held liable and its product can be deemed unreasonably dangerous if the product "does not conform to an express warranty made at any time by the manufacturer," and the warranty "induced the claimant or another person or entity to use the product and the claimant's damage was proximately caused because the express warranty was untrue."[97] If there is nothing in the record to indicate the existence of an express warranty, summary judgment dismissing the claim based upon the failure to conform to an express warranty is appropriate.[98]

In this case, Plaintiff's express warranty claim must fail because Plaintiff points to no express warranty DePuy made that induced her treating surgeon to use the DePuy plate. To survive summary judgment on an LPLA express warranty claim, a plaintiff must offer evidence that: (1) the manufacturer made an express warranty about the product; (2) the plaintiff was induced to use the product because of that express warranty; (3) the product failed to conform to that express warranty; and (4) the plaintiff's damages were proximately caused because the express warranty was untrue.[99] Here, Plaintiff does not describe what "express warranty" or promise DePuy allegedly made regarding the subject plate. Plaintiff's Amended Complaint merely alleges, in conclusory terms, the breach of an "express warranty,"[100] and Plaintiff has offered no summary judgment evidence describing this purported warranty. The LPLA requires a specific, stated warranty to hold a manufacturer liable under this prong of the Act.[101] When the plaintiff cannot specify the express warranty made by the defendant, and makes only general allegations that a

---

[97] LA. REV. STAT. § 9:2800.57(A).
[98] *Clay v. Int'l Harvester Co.*, 674 So.2d 398, 412 (La. App. 3 Cir. 5/8/96).
[99] *Couturier v. Bard Peripheral Vascular, Inc.*, 548 F. Supp. 3d 596, 611 (E.D. La. 2021) (citing *Broussard v. Procter & Gamble Co.*, 463 F. Supp. 2d 596 (W.D. La. 2006)).
[100] R. Doc. 38 at ¶ 30.
[101] *Reynolds v. Bordelon*, 172 So. 3d 607, 615 (La. 2015) ("The LPLA makes it very clear that in order for the manufacturer to be liable, there must be a specified stated warranty, i.e, *express*.").

product failed to conform to an express warranty, the defendant is entitled to summary judgment.[102]

Not only did DePuy not make an express warranty, it actually provided a warning in its package insert that expressly warned its users of the potential risk of breakage.[103] While summary judgment is appropriate in this case because Plaintiff has failed to show DePuy made an express warranty, Plaintiff's express warranty claim also fails because she cannot prove that a warranty from DePuy induced her physician to select this DePuy plate. Indeed, Dr. Mautner specifically denied relying on any express warranty from DePuy when he selected the DePuy plate for her surgery.[104] Based upon all the foregoing, Plaintiff's express warranty claim cannot survive summary judgment.

### E. Plaintiff's Implied Warranty Claim

Plaintiff has also alleged a so-called implied warranty claim. While the LPLA, which establishes "the exclusive theories of liability for manufacturers for damage caused by their products,"[105] provides a remedy for breach of an express warranty,[106] it does not recognize a cause of action against a manufacturer for breach of an *implied* warranty. Because a claimant may not recover from a manufacturer for damage caused by a product on the basis of any theory not set forth in the LPLA,[107] and because there is no cause of action for failure to conform to an implied warranty under the LPLA,[108] Plaintiff's implied warranty claim is not cognizable under Louisiana law. DePuy is, therefore, entitled to summary judgment on Plaintiff's implied warranty claim.

---

[102] *Summers v. FCA US LLC*, No. 23-1777, 2024 WL 3925169, at *6 (E.D. La. Aug. 23, 2024).
[103] R. Doc. 97-5 at 3.
[104] R. Doc. 106-3 at 101.
[105] LA. REV. STAT. § 9:2800.52.
[106] LA. REV. STAT. § 9:2800.58.
[107] *Scianneaux v. St. Jude Med. S.C., Inc*., 961 F. Supp. 2d 808, 811–12 (E.D. La. 2013).
[108] *See, e.g.*, *Jefferson v. Lead Indus. Ass'n, Inc*., 106 F.3d 1245, 1251 (5th Cir. 1997); *Summers*, 2024 WL 3925169, at *5 (granting summary judgment on breach of implied warranty claim due to the LPLA's exclusivity provision);

### F. Plaintiff's Redhibition Claim

Notwithstanding the exclusivity provision of the LPLA, the Act preserves a claim in redhibition "only to the extent the claimant seeks to recover the value of the product or other economic loss."[109] To prevail, a plaintiff must prove: (1) the thing sold is absolutely useless for its intended purpose, or its use is so inconvenient that it must be supposed it would not have been purchased had the purchaser known of the defect; (2) the defect existed at the time of purchase, but was neither known or apparent to the purchaser; and (3) the seller was given the opportunity to repair the defect.[110]

As a threshold matter, Plaintiff cannot prove the plate was "absolutely useless" for its intended purpose of promoting bone healing because plaintiff's plate remained intact long enough to allow the uppermost part of her tibia to heal.[111] When Dr. Mautner removed the plate, Plaintiff's tibia had healed enough for him to use an intramedullary nail to repair the remaining unhealed bone on the lower part on the tibia,[112] and Dr. Mautner admitted the plate worked well for Plaintiff because the plate enabled her bone to heal the part of her tibia closest to the knee joint.[113] While proof that the plate was not useless for its intended purpose should end the inquiry on whether Plaintiff has a claim under Louisiana redhibition law (because she cannot meet even the first element of the claim), Plaintiff is also unable to meet any of the other required elements of a redhibition claim because, for all the reasons set forth above in the LPLA analysis, the evidence

---

*Rhodes v. Covidien LP*, No. 18-10667, 2019 WL 2162845, at *2 (E.D. La. May 17, 2019) (dismissing with prejudice breach of implied warranty claim as precluded by the LPLA).
[109] *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 251 (5th Cir. 2002).
[110] *Alston v. Fleetwood Motor Homes of Ind. Inc.*, 480 F.3d 695, 699 (5th Cir. 2007). While it is undisputed DePuy was not given an opportunity to repair any alleged defect, R. Doc. 106-1 at 7, the Court need not address the applicability of this prong of the redhibition analysis in the instant case because, as shown herein, Plaintiff cannot meet any of the other necessary elements of a Louisiana redhibition claim.
[111] R. Doc. 97-6 at 25–26.
[112] *Id.*
[113] *Id.*

16

simply does not support a claim that the plate contained a hidden design defect or was mis-manufactured or contained an inadequate warning when Dr. Mautner admitted he was well-aware of the risk of plate breakage, and he knew that the screw holes were the weakest parts of the plate. Because Plaintiff cannot prove her plate was so useless that it would not have been purchased, and because she cannot even prove it was defective in the first place,[114] Plaintiff, therefore, cannot prove essential elements for a claim under Louisiana's law of redhibition, requiring the Court to grant summary judgment in DePuy's favor on this claim as well.

### G. Plaintiff's FDA Complaint Argument

Plaintiff also contends a Complaint Report DePuy sent to the FDA creates a material issue of fact fatal to summary judgment because the report is an admission by DePuy that its product may have caused or contributed to Plaintiff's injury.[115] This contention is without merit. While medical device manufacturers are required by law to report all adverse events involving their devices to the FDA,[116] satisfying this reporting requirement does not amount to an admission by DePuy that its product caused or contributed to the reportable event.[117] The Court has found no authority (and Plaintiff supplies none) to suggest that a manufacturer's compliance with regulatory reporting requirements in this context constitutes an admission of causation of a plaintiff's damages, and this Court declines Plaintiff's invitation to embark on that course in this case.

---

[114] *See Phillips v. Med. Device Bus. Servs., Inc.*, No. 21-30296, 2022 WL 1117687, at *4 (5th Cir. Apr. 12, 2022) (citing *Grenier v. Medical Engineering Corp.*, 243 F.3d 200, 203 (5th Cir. 2001)).
[115] R. Doc. 106 at 14–16.
[116] 21 C.F.R. § 803.50.
[117] 21 C.F.R. § 803.16; *see also Pinsonneault v. St. Jude Med., Inc.*, 953 F. Supp. 2d 1006, 1015 (D. Minn. 2013) (finding that the submission of a medical device report "is not necessarily an admission that the device . . . caused or contributed to the reportable event").

## IV. CONCLUSION

For all the foregoing reasons, DePuy's Motion for Summary Judgment[118] is **GRANTED**, and all of Plaintiff's claims are **DISMISSED WITH PREJUDICE**.

New Orleans, Louisiana, this 29th day of July 2025.

*[signature]*
**DARREL JAMES PAPILLION**
**UNITED STATES DISTRICT JUDGE**

---

[118] R. Doc. 97.